UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


OMAR F. BARNES,

                    Plaintiff,

v.                                    Case No. 3:07-cv-725-J-12MCR

STEVEN SINGER,
etc.; et al.,

                    Defendants.
_____


**ORDER**

**I. Status**

On May 4, 2007, Plaintiff Omar Franklin Barnes, an inmate of

the Florida penal system proceeding pro se and in forma pauperis,

initiated this action by filing a Civil Rights Complaint pursuant

to 42 U.S.C. § 1983 in the United States District Court for the

Northern District of Florida.  On May 16, 2007, the Court ordered

Plaintiff to file an Amended Complaint, and Plaintiff filed an

Amended Complaint on June 1, 2007.  On August 3, 2007, the United

States District Court for the Northern District of Florida

transferred the case to this Court for further proceedings.

Thereafter, Plaintiff filed a Second Amended Complaint (Doc. #9).

On September 25, 2007, this Court ordered Plaintiff to file a Third

Amended Complaint.  See Court's Order (Doc. #10).

Plaintiff is now proceeding before this Court on his Third Amended Civil Rights Complaint (hereinafter Third Amended Complaint) (Doc. #11), filed October 4, 2007. In support of his Third Amended Complaint, he submitted exhibits (Doc. #12). Plaintiff names the following individuals as the Defendants in the action: (1) Steven Singer, the Warden of Columbia Correctional Institution; (2) Bobby Martin,[1] a former employee of the Florida Department of Corrections who was the Classification Supervisor at Columbia Correctional Institution during the relevant time period; (3) Caroline Whitehurst, a former employee of the Florida Department of Corrections who was a senior classification officer at Columbia Correctional Institution during the relevant time period; (4) Kimberly Cloud,[2] a classification officer at Columbia Correctional Institution during the relevant time period; and (5) Silvia Williams,[3] the Interstate Corrections Compact Administrator for the Florida Department of Corrections during the relevant time period.

Plaintiff claims that, on August 19, 2005, Defendant Singer did not inform him that the state of Texas had requested his

_____

[1] The correct spelling of Defendant's last name is "Marton." He will be hereinafter referred to as Defendant Marton.

[2] Defendant's name is now Kimberly Kennedy, and she will be hereinafter referred to as Defendant Kennedy.

[3] The correct spelling of Ms. Williams' first name is "Sylvia."

extradition and did not advise him of his rights to contest the extradition. He further contends that the institutional classification team (Defendants Marton, Whitehurst and Kennedy) failed to afford him a pre-transfer hearing between August 2005 and September 2005. Finally, he argues that Defendant Williams, as the Interstate Corrections Compact Administrator, approved Plaintiff's transfer in the absence of any signed documentation stating that he had been advised of his rights and in the absence of any record that he had been given a pre-transfer hearing. As relief, Plaintiff requests punitive and nominal damages as well as injunctive relief.

Before this Court is Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. #58) with exhibits (hereinafter Defendants' Ex.). Since Plaintiff is appearing pro se, the Court advised him of the provisions of Fed. R. Civ. P. 56 and gave him an opportunity to respond. See Court's Order (Doc. #60), filed December 24, 2008, at 1, paragraph 2; Order of Special Appointment; Service of Process Upon Defendants; Notice to Plaintiff (Doc. #20) (setting forth the provisions of Rule 56 of the Federal Rules of Civil Procedure), filed April 17, 2008, at 4-5. This Court granted Plaintiff additional time to respond, and Plaintiff filed his Opposition (Docs. #61, #62) with exhibits (hereinafter Plaintiff's Ex.). Thus, Defendants' Motion to Dismiss

or in the Alternative, Motion for Summary Judgment (Doc. #58) is now ripe for review.

## II.  Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

> The movant bears the responsibility for demonstrating the basis for the summary judgment motion. [Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).] A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357

F.3d 1256, 1260 (11th Cir. 2004) (citing
<u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505).

> "When a moving party has discharged its
> burden, the non-moving party must then 'go
> beyond the pleadings,' and by its own
> affidavits, or by 'depositions, answers to
> interrogatories, and admissions on file,'
> designate specific facts showing that there is
> a genuine issue for trial." <u>Jeffery v.</u>
> <u>Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94
> (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at
> 324, 106 S.Ct. 2548). If there is a conflict
> between the parties' allegations or evidence,
> the non-moving party's evidence is presumed to
> be true and all reasonable inferences must be
> drawn in the non-moving party's favor. <u>Shotz</u>
> <u>v. City of Plantation, Fla.</u>, 344 F.3d 1161,
> 1164 (11th Cir. 2003).

<u>Allen v. Bd. of Pub. Educ. for Bibb County</u>, 495 F.3d 1306, 1313-14
(11th Cir. 2007).

"It is true that on a motion for summary judgment, all
reasonable inferences must be made in favor of the non-moving
party." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962,
970 (11th Cir. 2002) (citation omitted). "A court need not permit
a case to go to a jury, however, when the inferences that are drawn
from the evidence, and upon which the non-movant relies, are
'implausible.'" <u>Id</u>. (citations omitted).

The United States Supreme Court has explained how to determine
whether there is a genuine issue for trial.

> At the summary judgment stage, facts must
> be viewed in the light most favorable to the
> nonmoving party only if there is a "genuine"
> dispute as to those facts. Fed. Rule Civ.
> Proc. 56(c). As we have emphasized, "[w]hen
> the moving party has carried its burden under

Rule 56(c), its opponent must do more than
simply show that there is some metaphysical
doubt as to the material facts . . . . Where
the record taken as a whole could not lead a
rational trier of fact to find for the
nonmoving party, there is no 'genuine issue
for trial.'" Matsushita Elec. Industrial Co.
v. Zenith Radio Corp., 475 U.S. 574, 586-587,
106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)
(footnote omitted). "[T]he mere existence of
some alleged factual dispute between the
parties will not defeat an otherwise properly
supported motion for summary judgment; the
requirement is that there be no genuine issue
of material fact." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986). When opposing parties
tell two different stories, one of which is
blatantly contradicted by the record, so that
no reasonable jury could believe it, a court
should not adopt that version of the facts for
purposes of ruling on a motion for summary
judgment.

Scott v. Harris, 550 U.S. 372, 380 (2007).

### III. Facts and Conclusions of Law

Plaintiff Omar Franklin Barnes is currently in the custody of
the Florida Department of Corrections and is serving a life
sentence for first degree murder. He also has a Texas life
sentence for murder. Both convictions are relevant to the issues
of this case.

On November 10, 2003, while in the custody of the Sheriff for
Cumberland County, North Carolina, Plaintiff Omar Franklin Barnes
waived his rights to contest extradition from North Carolina to
Escambia County, Florida. Defendants' Ex. A, Waiver of

Extradition. The state of Florida sought Omar Franklin Barnes for trial on the charge of murder in Escambia County, Florida. Id.

Thereafter, Barnes was tried and convicted for first degree murder in Escambia County, Florida (Case No. 2003 CF 005488) and was sentenced to a term of life imprisonment on April 6, 2005. Defendants' Ex. B; see http://www.dc.state.fl.us/ActiveInmates (website for the Florida Department of Corrections) (reflecting Barnes' April 6, 2005, life sentence in Case No. 0305488).

On April 13, 2005, Barnes was received into the Florida Department of Corrections' custody to serve his life sentence. Defendants' Ex. C; see http://www.dc.state.fl.us/ActiveInmates. Barnes was ultimately housed at Columbia Correctional Institution. Defendants' Ex. C. Barnes' assigned classification officer, during the relevant time period, was Defendant Kimberly Kennedy. Defendants' Ex. D, Affidavit/Declaration of Kimberly Kennedy (hereinafter Kennedy Affidavit).

Plaintiff Barnes, through his counsel (Steven A. Been, Assistant Public Defender), appealed his Escambia County murder conviction. Defendants' Ex. E. Between July 27, 2005, and October 26, 2005, Barnes, through counsel, filed three motions for extensions of time to file the initial brief, which were granted by the appellate court. Id. On November 9, 2005, Barnes, through counsel, filed the initial brief in the First District Court of

Appeals.  Id.  On December 14, 2005, Barnes, though counsel, filed a reply brief.  Id.

On or about December 14, 2005, Barnes, who was dissatisfied with counsel, filed a pro se Motion to Abate/Set Aside Appellant's Initial Brief; however, the motion was apparently returned to Barnes for his failure to sign the motion.  Id.  On or about January 10, 2006, Barnes signed and refiled the pro se Motion to Abate/Set Aside Appellant's Initial Brief, seeking to abate the appeal until his return to Florida and to set aside the initial brief filed by his counsel.  Id.  In the Motion to Abate, Barnes explained that he had been extradited to Texas on September 15, 2005, and thus has no access to the necessary legal research and other materials to adequately pursue his Florida appeal.  Id.  In support of his argument, Barnes attached exhibit A (a November 17, 2005, letter from his appellate counsel instructing him that if he wished to have new legal counsel or to have an opportunity to submit a new initial brief raising new claims, then he should file a motion in the court requesting the appointment of new legal counsel).  Id.  Instead of requesting new counsel, Barnes filed the Motion to Abate.  On January 20, 2006, the First District Court of Appeals denied Barnes' Motion to Abate.  Id.  On January 25, 2006, Barnes, through counsel, filed an amended reply brief.  Id.  On April 19, 2006, the appellate court per curiam affirmed without issuing a written opinion.  Barnes v. State, 931 So.2d 903 (Fla.

1st DCA 2006); Defendants' Ex. E.  The mandate was issued on July 6, 2006.  Defendants' Ex. E.

On May 2, 2006, Barnes filed a _pro_ _se_ Motion, requesting that the appellate court review appellate counsel's competency to represent him or appointment new counsel.  _Id_.  The appellate court denied the motion on May 12, 2006.  _Id_.  On or about August 30, 2006, Barnes filed a _pro_ _se_ petition for writ of habeas corpus, alleging the ineffectiveness of appellate counsel, which was denied on the merits on September 29, 2006.  Defendants' Ex. F at 10; Barnes v. State, 943 So.2d 814 (Fla. 1st DCA 2006) (per curiam).

As previously noted, Barnes' extradition to Texas is relevant to the issues in this case.  On August 25, 2004, Barnes was indicted for murder by a Texas (Bexar County) grand jury, and a warrant for his arrest was issued.  Defendants' Ex. G.  On this date, Barnes was still incarcerated in Escambia County Jail, awaiting trial for murder in Escambia County (Case No. 2003 CF 005488).  Defendants' Ex. B.

After Barnes was convicted in Escambia County, Florida (Case No. 2003 CF 005488) and transferred into the custody of the Florida Department of Corrections, the state of Texas, on June 8, 2005, requested that the Florida Department of Corrections lodge a detainer for the Bexar County Sheriff's Office relating to Barnes' murder charge in Bexar County, Texas (Case No. 2004 CR 60555). Defendants' Ex. H; _see_ http://www.dc.state.fl.us/ActiveInmates

- 9 -

(Florida Department of Corrections' website reflecting the detainer date as June 9, 2005). On June 29, 2005, the Florida Department of Corrections, Columbia Correctional Institution, Classification Department sent an interoffice memorandum to Barnes to inform him that the Bexar County Sheriff's Office had filed a detainer for the charge of murder in Case No. 2004 CR 60555. Defendants' Ex. H, Interoffice Memorandum.

According to Defendants Whitehurst and Kennedy, upon receipt of the Texas detainer, Kennedy (as Barnes' assigned classification officer) requested the assistance of Whitehurst (a senior classification officer). Kennedy Affidavit; Ex. I, Affidavit/Declaration of Caroline Whitehurst (hereinafter Whitehurst Affidavit). Defendant Kennedy was new to her position as a classification officer at that time and had not handled an Interstate Agreement on Detainers (hereinafter IAD) transfer; she was not familiar with the procedures and inmate rights relating to detainers and extradition and therefore needed help advising Barnes of his rights under the IAD. Id. Therefore, Defendant Kennedy sought assistance from a more experienced classification officer, and Defendant Whitehurst agreed to assist Kennedy with Barnes' detainer. Id.

According to both Defendants, Barnes was called out to the classification department so that they could inform him of the existence of the Texas detainer and his rights under the IAD. Id.

Defendant Whitehurst, in the presence of Defendant Kennedy, explained to Barnes his rights under the IAD. Id. Specifically, Defendant Whitehurst recalled the following discussion with Barnes.

> I specifically advised Barnes that he could sign the IAD [(Interstate Agreement on Detainers)] paperwork and therefore prompt his "speedy trial" rights as to the Texas charges. I also advised Barnes that should he refuse to sign the IAD paperwork[,] he would not be immediately extradited by Texas, but that Texas could continue to pursue extradition and would eventually take custody of him anyway.

Whitehurst Affidavit at 2. Both Defendants Kennedy and Whitehurst recalled that Barnes refused to sign the IAD paperwork and objected to being transferred to Texas. Whitehurst Affidavit; Kennedy Affidavit. Thus, by not signing the IAD paperwork, he refused to exercise his speedy trial rights under the IAD. Id. Pursuant to Defendant Whitehurst's instructions to make a notation, Defendant Kennedy noted Barnes' refusal to sign the IAD paperwork by documenting on the paperwork itself "refusal to sign" on the lines where he was required to sign. Id.

Defendant Whitehurst further recalled that she instructed Defendant Kennedy "to send an email to Tallahassee notifying the IAD office that Barnes refused to sign the paperwork." Whitehurst Affidavit at 2. However, Defendant Kennedy did not recall Whitehurst's instructions for her to contact the Central Office and noted: "I do not believe that I in fact did contact Central Office." Kennedy Affidavit at 2. Thus, it appears that neither

Defendant Kennedy nor Defendant Whitehurst informed Central Office and thereafter neither scheduled the pre-transfer hearing with the local State Attorney.  Whitehurst Affidavit; Kennedy Affidavit.

After Barnes refused to sign the IAD paperwork and Defendant Kennedy noted Barnes' refusal on the paperwork, Defendant Kennedy, at that time, believed that she "had satisfied [her] responsibilities."  Kennedy Affidavit at 3.  Defendant Kennedy is now aware of the requirements, stating in pertinent part:

> I have been informed by my legal counsel that Barnes' inmate file contains IAD Forms V and VI, along with a cover letter from Susan Reed indicating that the IAD Forms V and VI were sent to Warden Singer on August 22, 2005. As requested by my legal counsel, I have reviewed the forms, and to the best of my knowledge, **I never received IAD Forms V and VI,** and I never saw them until my attorney recently provided them to me for review.

> **While I am now aware that an inmate's classification officer is responsible for scheduling a hearing for the inmate after an inmate rejects an IAD transfer, at the time in question I was new to my position and unfamiliar with the IAD process.  As a result, I relied on a Senior Classification Officer to guide me through the necessary steps.  After Barnes refused to sign the IAD paperwork and I noted his refusal on the paperwork, at that point in time I believed that I had satisfied my responsibilities.**

> I am now aware that there exists an internal manual that sets out the steps to process IAD requests.  However, at the time in question[,] I was not aware that there was such a manual.  In addition, I was unaware that I even needed to seek out additional guidance on the issue because I believed that

> by noting on the IAD forms that Barnes
> "refused to sign" I had satisfied my
> responsibilities and that there were no
> further steps that needed to be taken.

Id. at 2-3 (emphasis added and enumeration omitted).

Further, Defendant Whitehurst states that, after she advised
Defendant Kennedy to make a note of Barnes' refusal to sign the IAD
paperwork and to send an email to Tallahassee notifying the IAD
office that Barnes refused to sign the paperwork, she had no other
involvement with Barnes' extradition to Texas. Whitehurst
Affidavit. Defendant Whitehurst explains:

> I was not notified and was not otherwise aware
> when Barnes' custody was rendered to Texas. I
> was not involved in the transfer and did not
> cause Barnes' release to the Texas
> authorities.
>
> I am aware that Barnes alleges that the
> Institutional Classification Team ("ICT") was
> responsible for his extradition to Texas.
> This is incorrect. The ICT has no involvement
> in the Interstate Agreement on Detainers
> process. In addition, Ms. Kennedy was not a
> member of the ICT.
>
> I am aware that Barnes alleges that he
> was treated differently as a result of his
> race or his sentence status. I deny that I
> took any action, or failed to take any action,
> based upon Barnes' race or sentence status. I
> performed my duties to the best of my ability
> and without regard to Barnes' race or
> sentence.

Id. Defendant Kennedy also explains:

> I am aware that Barnes claims that I
> intentionally acted to deprive him of a pre-
> transfer hearing because of his race or his
> status as a life sentenced inmate. I deny

> that I intentionally or deliberately acted to
> deprive Barnes of any of his rights. I also
> deny that my actions were motivated by or
> influenced by Barnes' race or sentence status.

Kennedy Affidavit.

After Defendants Kennedy and Whitehurst's meeting with Barnes, the Texas authorities (Susan D. Reed, Criminal District Attorney in Bexar County, Texas), on August 22, 2005, sent the IAD forms V (Request for Temporary Custody) and VI (Evidence of Agent's Authority to Act for Receiving State) directly to the Columbia Correction Institution (to the attention of Defendant Steven Singer, the Warden), requesting the temporary custody of Barnes. Defendants' Ex. J. Defendant Warden Steven Singer states in pertinent part:

> I was not directly involved in Barnes'
> temporary transfer of custody to the state of
> Texas in 2005. As warden of a major
> institution, I receive a large volume of
> correspondence and official documentation on a
> daily basis. Therefore, I must delegate
> responsibility to my staff to handle many of
> the documents that I receive. In the case of
> transfers under the Interstate Agreement on
> Detainers ("IAD"), I rely on the
> classification staff and their supervisors to
> process the transfer requests. Accordingly,
> **when I receive IAD related documents, it is my
> custom and practice to forward these documents
> to the institution's classification staff and
> their supervisors for handling.** Thereafter, I
> have no further involvement in IAD issues.
>
> To the best of my knowledge[,] I was not
> consulted by classification staff when the
> state of Texas sought custody of Barnes in
> 2005.

- 14 -

> I am aware that Barnes claims that I
> intentionally acted to deprive him of a pre-
> transfer hearing because of his race or his
> status as a life sentenced inmate. I deny
> that I intentionally or deliberately acted to
> deprive Barnes of any of his rights. I also
> deny that my actions were motivated by or
> influenced by Barnes' race or sentence status.

Defendants' Ex. L, Affidavit/Declaration of Steven Singer
(hereinafter Singer Affidavit) (emphasis added). However, although
Barnes' inmate file contains IAD forms V and VI along with the
August 22, 2005, cover letter from Susan Reed (the Criminal
District Attorney) indicating that the IAD forms V and VI were sent
to Warden Singer, Defendant Kennedy states that she never received
the IAD forms V and VI and therefore was not aware that any further
steps needed to be taken. Defendants' Ex. J; Kennedy Affidavit.

On September 15, 2005, Barnes' custody was temporarily
transferred to the custody of the state of Texas. Defendants' Ex.
K. At that time, Barnes had not been given a pre-transfer hearing.
While none of the Defendants caused or otherwise authorized
Plaintiff's temporary release to the custody of the state of Texas
(Kennedy Affidavit; Whitehurst Affidavit; Singer Affidavit;
Defendants' Ex. M, Affidavit/Declaration of Robert Marton
(hereinafter Marton Affidavit); Defendants' Ex. N,
Affidavit/Declaration of Sylvia Williams (hereinafter Williams
Affidavit)), it is clear, as acknowledged by the Defendants, that
"there were errors in the processing of Barnes' temporary

transfer"[4] and that he "should have had a pre-transfer hearing and
there is no evidence this took place." Plaintiff's Index of
Exhibits (Doc. #12), Exhibit C, Response, dated April 10, 2007
("Contact with the department's Legal section indicates [Barnes]
should have had a pre-transfer hearing and there is no evidence
this took place. [Barnes was] also supposed to execute and sign
form DC6-148 of which no copy can be found."); Plaintiff's Ex. 4.

The record reflects that Defendants Warden Singer, Marton and
Williams had no direct involvement in the temporary transfer of
Plaintiff Barnes to Texas without a pre-transfer hearing. Singer
Affidavit; Marton Affidavit; Williams Affidavit. As supervisors,
they relied on the institutional staff (the classification office,
specifically the assigned classification officer) to properly
process the IAD documentation.

Defendant Singer (the Warden of Columbia Correctional
Institution, who receives a large volume of correspondence and
official documentation on a daily basis), as a matter of custom and
practice, forwards all IAD documentation to the classification
office for handling. Singer Affidavit. Thereafter, he relies on
the classification staff to properly process the IAD transfers of
custody. Id. He was not consulted by the classification staff
when the state of Texas sought custody of Barnes in 2005. Id.

---

[4] See Motion to Dismiss or in the Alternative, Motion for
Summary Judgment (Doc. #58) at 16.

Similarly, Defendant Marton (the classification supervisor) was not directly involved in the Barnes' transfer to the state of Texas in 2005. Marton Affidavit. As the supervisor, Defendant Marton relied on the inmate's assigned classification officer to properly process Barnes' transfer. Id. While Defendant Marton was available to advise the classification staff, the staff did not request his assistance. Id. Because he was not personally consulted on the matter, Defendant Marton had no reason to know that there was an issue with respect to Barnes' IAD transfer. Id.

Further, Defendant Williams, who served as the Interstate Corrections Compact Administrator and the IAD Administrator during the relevant time period, had no personal involvement in Barnes' transfer to Texas. Williams Affidavit. She did not personally authorize his release from custody and did not otherwise cause his release without the benefit of the pre-transfer hearing. Id. As the IAD administrator, she had to rely on institutional staff to properly process the IAD transfers and to inform her when her assistance was needed. Id. She was not personally consulted on the matter, and therefore had no reason to know that there was an issue relating to Barnes' transfer to Texas. Id.

Defendant Williams explained the IAD Administrator position as "a very limited role." Id. Specifically, she explained the position of IAD Administrator as well as the process by which

inmates are delivered into the temporary custody of other states under the IAD.

> **The IAD Administrator must rely on institutional staff to carry out the requirements of the IAD, including advising an inmate of his rights under the IAD and scheduling a hearing in court should an inmate object to an IAD transfer.**

> The IAD Administrator's limited role in the transfer of an inmate is evident from a review of the process by which inmates are delivered into the temporary custody of other states under . . . the IAD.

> The process by which the Florida Department of Corrections transfers custody under the IAD differs depending on whether it is the inmate or the prosecutor who requests the transfer:

> <u>Inmate Requests Final Disposition of Out of State Detainer</u>

> Upon notice of a detainer for an untried indictment, information, or complaint, institutional staff must advise the inmate of his rights to request final disposition of the outstanding charges and to be brought to trial within 180 days should he formally request final disposition of the charges. To this end, an inmate should be provided with the IAD Form I, "Notice of Untried Indictment, Information or Complaint and of Right to Request Disposition," and IAD Form II, "Notice of Place of Imprisonment and Request for Disposition of Indictments, Information or Complaints." Form I only serves as acknowledgment that an inmate has received notice that a detainer has been filed. Whereas, the inmate's signing of IAD Form II serves as an agreement to be temporarily transferred to the detainer state's custody for final disposition of the outstanding charge.

If an inmate signs IAD Form II, IAD Forms III and IV will be completed, and copies provided to the inmate and to the IAD Administrator in Central Office. Upon receipt of IAD Forms II - IV, the IAD Administrator will forward a copy to the prosecutor in the requesting state, thereby triggering the running of the 180 [day] time period within which the requesting state must bring the inmate to trial on the outstanding charges or else face dismissal of the charges with prejudice.

When the requesting state receives the signed and completed IAD Forms II, III and IV, the requesting state's official must complete IAD Form VI and VII and forward same to the sending state's IAD Administrator. Thereafter, the inmate may be picked up for transfer to the requesting state's custody, on the date and by the agent(s) identified on IAD Form VI.

## PROSECUTOR REQUESTS FOR FINAL DISPOSITION

Where an inmate does not exercise his speedy trial rights under the IAD after being notified of a detainer, the requesting state may nevertheless obtain temporary custody of the inmate through a process that takes into account the inmate's rights to contest the transfer.

Upon notice by the institution that the inmate declines the offer to request final disposition of the outstanding charges, [the] Florida Department of Corrections' IAD Administrator will notify the requesting state. Thereafter, the requesting state may initiate a temporary transfer of custody by sending IAD Form V, "Request for Temporary Custody."

When Florida's IAD Administrator receives the requesting state's IAD Form V, Florida's IAD Administrator will inform the Governor's

office in writing that a party state has requested the temporary custody of the inmate. No request for temporary custody should be honored until a thirty day period has elapsed after notification to the Governor's office. Florida's IAD Administrator will also forward a copy of the IAD Form V to the institution at which the inmate is housed. **The inmate's classification officer is then responsible for discussing the other state's request for custody with the inmate and for advising the inmate of his options with Form V-A:** (1) he could agree to waive his rights by signing IAD Form V-B in front of a judge; (2) he could petition the Governor to contest the transfer; or (3) **he could request that he be brought before a judge, informed of the right to counsel, and scheduled for a habeas hearing. Once the inmate selects his preferred option, a copy of Form V-A shou[l]d be forwarded to the IAD Administrator.**

If the inmate selects option one, the classification officer will arrange with the State Attorney's Office for the inmate to sign IAD Form V-B in the presence of a circuit judge. Upon completion of IAD Form V-B (including the judge's and the inmate's signatures), the institutional staff will send copies of IAD Forms III, IV, V-B, to the IAD Administrator in Central Office, who will then forward a copy of those completed forms to the requesting state's prosecutor. At that point, the requesting state's prosecutor should send IAD Form VI with original signatures to Florida's IAD Administrator. Upon receipt of Form VI, the inmate will be available for the requesting state's agent to assume custody.

**Where an inmate does not choose option one, the classification officer will write to the local State Attorney requesting a pre-transfer hearing be scheduled in the circuit court.** The State Attorney's office is

responsible for scheduling and providing notice of a pre-transfer hearing before the circuit court. If the judge rules in favor of the inmate at the pre-transfer hearing, the ruling forecloses the requesting state's ability to obtain custody of the inmate. However, if the judge orders the inmate remanded to the requesting state, the classification office will send copies of the IAD Forms III, IV, and V-B to the IAD Administrator in Central Office, who in turn will notify the requesting state that the inmate will be available for transfer by their agent upon the institution's receipt of IAD Form VI.

Upon receipt of IAD Form VI, and prior to the inmate's transfer to the requesting state's custody, the institution is responsible for verifying that the institution file contains completed IAD Forms III, IV, V, and VI, and either a court order remanding the inmate to the requesting state or a signed IAD Form V-B. The institution is also responsible for contacting the local State Attorney and verifying that no further petitions are pending that would prevent the inmate's temporary transfer to the requesting state (only if the inmate did not sign Form V-B). Upon verification that all relevant IAD Forms are in the inmate file and that no petitions are pending that would prevent the inmate's temporary transfer[,] the inmate is available for the requesting state to pick-up.

In Barnes' case, the IAD Administrator's Office received and documented a detainer filed by Texas and forwarded same to the institution for further processing. Thereafter, I was not further involved in the matter. I was not informed by the institution that Barnes declined to exercise his speedy trial rights under the IAD or that he objected to the transfer to Texas to resolve the

outstanding charges.  In addition, I was not contacted by the institution or Texas authorities for assistance with Barnes' IAD matter.

I am aware that a 2007 grievance response informed Barnes that the Interstate Compact Administrator had stated that Barnes signed a waiver of rights form while he was in county jail.  I do not recall being contacted by Warden Singer's office in 2007 regarding Barnes' transfer to Texas, and I cannot explain why the Warden's Office informed Barnes that the Administrator stated that he had signed a waiver of rights form while in county jail.

I am aware that Barnes alleges that the Institutional Classification Team (the "ICT") played a role in his temporary transfer to Texas.  However, Barnes is incorrect; the ICT is not involved in interstate transfers under the IAD.  While the ICT is involved in transfers of inmates between states under the Interstate Corrections Compact, Barnes' transfer to Texas was not pursuant to the Interstate Corrections Compact as he was transferred temporarily for the sole purpose of resolving outstanding charges pursuant to the Interstate Agreement of Detainers. Likewise, the Department of Corrections' administrative rules governing transfers under the Interstate Corrections Compact . . . were not applicable to Barnes' transfer to Texas.

I am aware that Barnes alleges that the Defendants intentionally treated him differently because he is African American and because of his life sentence.  I deny that I intentionally denied Barnes any of his legal rights.  I also deny that I made any decisions or took any actions on the basis of, or motivated by, the fact that Barnes is African American or that he is serving a life sentence.

Id. (emphasis added and enumeration omitted). Defendant Williams, in her limited role as the IAD Administrator, received and documented the detainer and "forwarded [the] same to the institution for further processing." Id. at 5. After that initial processing, she was not further involved in the matter; the institution never informed her that Barnes had declined to exercise his speedy trial rights under the IAD or that he objected to the transfer to Texas. Id.

On May 18, 2006, Barnes was convicted for the crime of murder in Bexar County, Texas, in Case No. 2004 CR 6055. Defendants' Ex. O. Barnes was sentenced to a term of life imprisonment. Id. He appealed his Texas conviction, and the appellate court affirmed his conviction on October 31, 2007. Id. On June 3, 2006, Barnes returned to the custody of the Florida Department of Corrections to serve his Florida life sentence. Defendants' Ex. P. Texas retains a detainer on Barnes in the event that he is released from his Florida sentence. Defendants' Ex. Q.

Now before this Court is Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. #58). Plaintiff claims that the Defendants violated his rights under the IAD and the Uniform Extradition Act when he was released to the temporary custody of Texas to face a murder charge in Bexar County, Texas, without the benefit of a pre-transfer hearing. Specifically, Barnes alleges that if he had been afforded a pre-transfer hearing,

he would have objected to the transfer on the basis that he was then pursuing a direct appeal of his Florida conviction. He also states that because of the transfer to Texas he suffered emotional injury and his ability to obtain a direct appeal of his Florida murder conviction was undermined. And, finally, he asserts that he has an active detainer and fears that he will again be transferred without the benefit of a pre-transfer hearing.

The IAD Act is a compact among the majority of the states (including Florida); it enables the participating state to gain custody of the prisoner incarcerated in another jurisdiction in order to try him or her on criminal charges. See Reed v. Farley, 512 U.S. 339, 341 (1994). The IAD compels the participating states to cooperate with each other in order to facilitate the timely transfer of inmates for purposes of disposing of outstanding charges.

Plaintiff Barnes contends that it was the duty of Defendants Singer, Marton, Whitehurst and Williams to ensure that his temporary transfer to Texas was in compliance with all relevant procedures. The Eleventh Circuit recently addressed supervisory liability in a section 1983 action as follows:

> In order to prevail on the merits in a §
> 1983 action against a defendant in his
> individual capacity, the plaintiff generally
> must show that he was personally involved in
> acts or omissions that resulted in the
> constitutional deprivation. Hale v. Tallapoosa
> County, 50 F.3d 1579, 1582 (11th Cir.1995).
> "[S]upervisory officials are not liable under

§ 1983 for the unconstitutional acts of their
subordinates on the basis of respondeat
superior or vicarious liability." <u>Cottone v.
Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003)
(quoting <u>Hartley v. Parnell</u>, 193 F.3d 1263,
1269 (11th Cir. 1999)).

A supervisor may be individually liable
under § 1983 only when: (1) "the supervisor
personally participates in the alleged
unconstitutional conduct"; or (2) "there is a
causal connection between the actions of a
supervising official and the alleged
constitutional deprivation." <u>Id</u>. A causal
connection is established when: (1) the
supervisor was on notice, by a history of
widespread abuse, of the need to correct a
practice that led to the alleged deprivation,
and he failed to do so; (2) the supervisor's
policy or custom resulted in deliberate
indifference; (3) the supervisor directed the
subordinate to act unlawfully; or (4) the
supervisor knew the subordinate would act
unlawfully and failed to stop the unlawful
action. <u>Id</u>. "The deprivations that constitute
widespread abuse sufficient to notify the
supervising official must be obvious,
flagrant, rampant and of continued duration,
rather than isolated occurrences." <u>Brown v.
Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990).

<u>Lloyd v. Van Tassell</u>, No. 07-11205, 2009 WL 179622, *4-5 (11th Cir.
Jan. 27, 2009) (per curiam) (not selected for publication in the
Federal Reporter); <u>Danley v. Allen</u>, 540 F.3d 1298, 1314 (11th Cir.
2008).

Plaintiff's allegations against Defendants Singer, Marton, and
Williams fall short of the burden that Plaintiff shoulders to bring
forth factual allegations that could support a supervisory
liability claim under section 1983. Defendants Singer, Marton and
Williams, as supervisors, properly relied on the institutional

staff (the classification office, specifically the assigned classification officer) to properly process the IAD documentation. See White v. Thompson, 299 Fed. Appx. 930, 934 (11th Cir. 2008) (per curiam) (not selected for publication in the Federal Reporter) (holding that the defendants were entitled to summary judgment with respect to plaintiff's due process claims regarding supervisory liability because plaintiff did not present any evidence that the defendants caused the alleged due process deprivation based on their actions as supervisors, and no evidence showed that a practice, policy or custom led to the alleged deprivation; but rather, the evidence indicated plaintiff's improper transfer "was an isolated error" caused by a county clerk).

With respect to Defendant Whitehurst (a senior classification officer), she agreed to assist Defendant Kennedy with Barnes' detainer. Defendant Whitehurst stated that she advised Barnes of his rights under the IAD and advised Defendant Kennedy to note Barnes' refusal to sign the IAD paperwork and to notify the IAD office in Tallahassee that Barnes had refused to sign the paperwork. As a more experienced classification officer, Defendant Whitehurst provided the assistance to Defendant Kennedy and had no reason to question whether Defendant Kennedy would follow through with her advice to notify the IAD office. Thereafter, Defendant Whitehurst was never notified that there was an IAD issue to be addressed; she had no other involvement with Barnes' extradition to

Texas.  Defendant Whitehurst was not officially assigned to train Defendant Kennedy and was not otherwise responsible for Kennedy's training.  <u>See</u> Plaintiff's Ex. 11.

Further, Plaintiff contends that the Institutional Classification Team (including Defendants Whitehurst and Marton) was responsible for his extradition to Texas; however, the record clearly reflects that the Institutional Classification Team has no involvement in the IAD process.  Whitehurst Affidavit; Marton Affidavit; Williams Affidavit.  And, while Plaintiff alleges that the Institutional Classification Team also included Defendant Kennedy, the record reflects that Kennedy was not a member of the Institutional Classification Team.  <u>See</u> Whitehurst Affidavit at 2.

With respect to Defendant Kennedy (Barnes' assigned classification officer), the record reflects that she, as a new employee, requested the assistance of Defendant Whitehurst when faced with the Barnes' IAD issue.  Whether actually advised to notify the Central Office or not about Barnes' refusal to sign the IAD paperwork, she does not believe that she did <u>in</u> <u>fact</u> contact the Central Office.  However, while Barnes' inmate file contains the IAD Forms V and VI along with the cover letter from Susan Reed indicating that the IAD Forms V and VI were sent to Warden Singer on August 22, 2005, Defendant Kennedy has stated that she "never received IAD Forms V and VI, and [she] never saw them until [her] attorney recently provided them to [her] to review."  Kennedy

Affidavit at 3. In fact, she did not receive any IAD forms between August 19, 2005, and September 15, 2005, that would have prompted the classification officer's responsibilities as set out in the IAD technical manual. See Plaintiff's Ex. 11.

Defendant Marton (the classification supervisor) explained that the IAD forms actually trigger the next steps to be taken.

> [A]s a matter of practice, an inmate's classification officer would not schedule an IAD pre-transfer hearing until the classification officer received IAD Form V.
>
> In addition, an inmate's classification officer would not receive IAD Form VI, because in practice that form is forwarded to the institution's sentence specialist, rather than to the inmate's classification officer. The institution's sentence specialist must compare the Form VI that she receives prior to the pick-up date to the Form VI presented by the out-of-state's agents when they arrive to pick-up the inmate. Accordingly, an inmate's classification officer is not necessarily notified that another state is scheduled to pick-up an inmate for a temporary IAD transfer. Likewise, an inmate's classification officer is not necessarily notified on the date that the inmate is actually released into the temporary custody of another state under the IAD.

Marton Affidavit at 2.

Thus, Defendant Kennedy, as the assigned classification officer, was clearly responsible for scheduling a pre-transfer hearing for Barnes after he opposed the IAD transfer; however, she relied upon a senior classification officer to guide her through the steps. At that point, she believed she had satisfied her

responsibilities. And, since she apparently never received the Form V to trigger the next step, she continued to believe her responsibilities were complete. It seems likely that, given her inexperience in the position, if she had received the Form V, she would have once again requested the assistance of the more experienced senior classification officer as to the next step in the IAD process.

Here, Plaintiff's claim that Defendant Kennedy failed to coordinate the scheduling of the pre-transfer hearing must be analyzed as a procedural due process claim. See Harden v. Pataki, 320 F.3d 1289, 1301 (11th Cir. 2003) (analyzing an extradition hearing claim as a procedural due process claim). However, Defendant Kennedy, acting without regard to Plaintiff's race, term of imprisonment or mental infirmities, "mistakenly believed her duties were satisfied when she noted on the IAD forms that Barnes had refused to sign them." Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment at 6. Defendants further acknowledge that the IAD "process faltered in this case simply because of a mistake" brought about by the fact that Barnes' assigned classification officer (Defendant Kennedy) was new to her position and therefore unfamiliar with the IAD process. Id. at 15. Thus, Defendants conclude that a procedural due process violation that is the product of mistake or innocent neglect cannot form the basis for a section 1983 action. Id. at 16. This Court agrees.

To sustain a section 1983 claim based upon a violation of procedural due process, a plaintiff must, at a minimum, prove recklessness or gross negligence and in some instances may be required to show a deliberate decision to deprive the plaintiff of due process. Mendoza v. Meisel, 270 Fed. Appx. 105, 107 (3rd Cir. 2008) (quotations and citations omitted) (not selected for publication in the Federal Reporter); Wantanabe Realty Corp. v. City of New York, 159 Fed. Appx. 235, 237 (2nd Cir. 2005) (not selected for publication in the Federal Reporter) ("In order to show a violation of procedural due process rights, a plaintiff must show an intent more culpable than mere negligence.") (citing Daniels v. Williams, 474 U.S. 327 (1986)); Howard v. Grinage, 82 F.3d 1343, 1350 (6th Cir. 1996) ("[W]e know from Daniels that 'arbitrary in the constitutional sense' for procedural due process purposes means conduct undertaken with something more than negligence.").

Thus, mere negligence is not a deprivation in the constitutional sense, especially when there has been no affirmative abuse of power. Based on the record, Defendant Kennedy's actions or inactions were not arbitrary in the constitutional sense, but were purely negligent. And, while it is unfortunate that Barnes did not have the benefit of the pre-transfer hearing, it was an isolated incident caused by mere human error. The IAD process faltered due to Kennedy's mistaken belief that she had fully

completed her duties. However, it was nothing more than negligence.

In sum, Defendant Kennedy's inactions, resulting in Plaintiff's temporary transfer to Texas without the benefit of the pre-transfer hearing, do not amount to a deprivation in the constitutional sense. See West v. Tillman, 496 F.3d 1321, 1327-28 (11th Cir. 2007) (noting that one defendant had been employed at the jail for only a few weeks and that the evidence shows at most that the defendants were negligent in failing to carry out their responsibilities); Porter v. White, 483 F.3d 1294, 1308 (11th Cir. 2007) (holding that "mere negligence or inadvertence on the part of a law enforcement official to turn over Brady material to the prosecution, which in turn causes a defendant to be convicted at a trial that does not meet the fairness requirements imposed by the Due Process Clause, does not amount to a 'deprivation' in the constitutional sense. Thus, a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a Brady violation.").

Plaintiff, in a conclusory fashion without factual or evidentiary support, claims that the Defendants' errors were the result of their personal bias against him based on his race, length of sentence and mental disability; however, he has failed to meet his burden of showing such bias. See Defendants' Affidavits

(denying that they took action, or failed to take action, based upon his race or sentence status, but rather performed their duties to the best of their abilities and without regard to his race or sentence status). The record supports the conclusion that any decisions, actions or inactions were <u>not</u> on the basis of, or motivated by the fact that Barnes is African American or that he is serving a life sentence or that he suffers mental infirmities. The Defendants performed their duties without regard to Barnes' race, sentence or mental infirmities.

Further, any claim that other people similarly situated were treated differently in support of his allegation that the Defendants acted intentionally is unfounded. Plaintiff mistakes the Interstate Corrections Compact and its associated administrative rule and procedures with the IAD. Transfers under the Interstate Corrections Compact differ from transfers under the IAD, and thus inmates subject to the Interstate Corrections Compact are not similarly situated to Barnes and therefore are not legitimate for comparison to Barnes for purposes of making an equal protection claim.

Further, Defendants contend that they are entitled to Eleventh Amendment immunity. Thus, to the extent that Plaintiff is suing Defendants in their official capacities, they are entitled to Eleventh Amendment immunity.

It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity that employs the officer. See McMillian v. Monroe County, 520 U.S. 781, 785 n.2 (1997); Kentucky v. Graham, 473 U.S. 159, 165 (1985). In Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986) (per curium), the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. Quern v. Jordan, 440 U.S. 332, 340-45, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited waiver of sovereign immunity was not intended to encompass section 1983 suits for damages. See Gamble, 779 F.2d at 1513-20.

Accordingly, in Zatler, the court found that the Secretary of the Florida Department of Corrections was immune from suit in his official capacity. Id. Thus, insofar as Plaintiff seeks monetary damages from Defendants in their official capacities, the Eleventh Amendment clearly bars suit.

Additionally, Defendants contend that they are entitled to qualified immunity.[5]  This Court has found that the Defendants have not violated Plaintiff's constitutional rights.  Thus, there is no need to proceed to the next step of determining if a constitutional right was clearly established.  <u>See</u> <u>Case v. Eslinger</u>, 555 F.3d 1317, 1326 (11th Cir. 2009) (citing <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 818 (2009) ("[T]here are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong.")).  It is clear that the Defendants are entitled to qualified immunity.

For the above-stated reasons, Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment will be granted, and judgment will be entered in favor of the Defendants.

---

[5] In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the United States Supreme Court established a two-part test to determine the applicability of qualified immunity.  The Court stated that the threshold inquiry in a qualified immunity analysis is:  whether the plaintiff's allegations, if true, establish a constitutional violation; and, if, under the plaintiff's allegations, the defendants would have violated a constitutional right, the next, sequential step is to ask whether the right was clearly established.  However, recently, in <u>Pearson v. Callahan</u>, 129 S.Ct. 808, 818 (2009), the Court held that the <u>Saucier</u> sequence, while often appropriate, should no longer be regarded as mandatory.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  <u>Id</u>.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. #58) is **GRANTED.**

2.    The Clerk of Court shall enter judgment in favor of the Defendants.

3.    The Clerk of Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this ___19th___ day of June, 2009.

*Howell W. Melton*
HOWELL W. MELTON
United States District Judge

sc 6/10
c:
Omar Franklin Barnes
Ass't Attorney General